# FEDERAL ELECTION COMMISSION ET AL. *v.* NATIONAL RIGHT TO WORK COMMITTEE ET AL.

No. 81–1506.   Argued November 1, 1982—Decided December 13, 1982

REHNQUIST, J., delivered the opinion for a unanimous Court.

*Charles N. Steele* argued the cause for petitioners. With him on the briefs were *Richard B. Bader, Miriam Aguiar,* and *Jeffrey H. Bowman.*

*Richard H. Mansfield III* argued the cause for respondents. With him on the brief were *George D. Webster, Edith D. Hakola,* and *Richard J. Clair.**

JUSTICE REHNQUIST delivered the opinion of the Court.

The question in the case ultimately comes down to whether respondent National Right to Work Committee (NRWC or respondent) limited its solicitation of funds to "members" within the meaning of 2 U. S. C. § 441b(b)(4)(C).[1]

In April 1977, petitioner Federal Election Commission (Commission)[2] determined that there was probable cause to

---

*\*J. Albert Woll, Laurence Gold,* and *Margaret E. McCormick* filed a brief for the American Federation of Labor and Congress of Industrial Organizations as *amicus curiae* urging reversal.

*H. Richard Mayberry, Jr.,* filed a brief for the Public Service Research Council et al. as *amici curiae* urging affirmance.

[1] As will appear from the following discussion, the phrasing of this question is but the tip of the statutory iceberg. The Federal Election Campaign Act of 1971 (Act) makes it "unlawful for . . . any corporation . . . to make a contribution or expenditure in connection with" certain federal elections. 90 Stat. 490, 2 U. S. C. § 441b(a). The term "contribution" is defined broadly, 2 U. S. C. § 441b(b)(2)(C), to include any sort of transfer of money or services to various political entities, but excluded from that definition is "the establishment, administration, and solicitation of contributions to a separate segregated fund to be utilized for political purposes by a . . . corporation without capital stock." The Act goes on to make it unlawful, except as thereinafter provided, "for a corporation, or a separate segregated fund established by a corporation, to solicit contributions to such a fund from any person other than its stockholders and their families and its executive or administrative personnel and their families . . . ." 2 U. S. C. § 441b(b)(4)(A). Finally, 2 U. S. C. § 441b(b)(4)(C) states that the prohibition just quoted "shall not prevent a . . . corporation without capital stock, or a separate segregated fund established by a . . . corporation without capital stock, from soliciting contributions to such a fund from members of such . . . corporation without capital stock."

[2] The Commission is an independent administrative agency vested with exclusive jurisdiction over civil enforcement of the Act. See 2 U. S. C. §§ 437c(b)(1) and 437d(a) and (e) (1976 ed., Supp. V).

believe that NRWC had violated the above-cited provisions of the Act by soliciting contributions from persons who were not its "members." Shortly thereafter, respondent filed a complaint in the United States District Court for the Eastern District of Virginia seeking injunctive and declaratory relief against the Commission. One month later, the Commission filed an enforcement proceeding against respondent in the United States District Court for the District of Columbia, seeking to establish respondent's violation of 2 U. S. C. § 441b. The actions were consolidated in the latter court, which granted summary judgment in favor of the Commission on the basis of stipulated facts. 501 F. Supp. 422 (1980).[3] The judgment of the District Court was reversed by the Court of Appeals for the District of Columbia Circuit, 214 U. S. App. D. C. 215, 665 F. 2d 371 (1981), and we granted certiorari. 456 U. S. 914 (1982).

Respondent NRWC is a nonprofit corporation without capital stock organized under the laws of the Commonwealth of Virginia. Given the central role of the congressional use of the word "member" in this litigation, it is useful to set forth respondent's organizational history in some detail. In 1975, respondent's predecessor and another corporation merged; the articles of merger filed in the District of Columbia by the successor corporation stated that NRWC "shall not have members." A similar statement is contained in the articles of incorporation of NRWC that are presently filed in Virginia. Likewise, respondent's bylaws make no reference to members or to membership in the corporation. The stated purpose of NRWC, according to its Virginia articles of incorporation, is "[t]o help make the public aware of the fact that American citizens are being required, against their will, to join and pay dues to labor organizations in order to earn a liv-

---

[3] The relief awarded the Commission by the District Court included a declaratory judgment that 2 U. S. C. § 441b(b)(4) is not unconstitutional, an order that NRWC refund to contributors the funds it had obtained from unlawful solicitations, and an order that the corporation pay a $10,000 civil penalty. App. to Pet. for Cert. 54a.

ing." App. to Pet. for Cert. 17a. In pursuance of this objective, NRWC regularly mails messages to millions of individuals and businesses whose names have found their way onto commercially available mailing lists that the organization has purchased or rented. The letters do not mention membership in NRWC, but seek donations to help NRWC publicize its opposition to compulsory unionism and frequently contain a questionnaire that the recipient is requested to answer and return.

In late 1975, in order to comply with § 441b, NRWC established a separate segregated fund, see § 441b(b)(4)(C),[4] "to receive and make contributions on behalf of federal candidates." The fund was denominated the "Employees Rights Campaign Committee" (ERCC); its operation was completely subsidized from the NRWC treasury, which paid all the expenses of establishing and administering the fund, and of soliciting contributions. During part of 1976, NRWC sent letters to some 267,000 individuals, who had at one time contributed to it, soliciting contributions to ERCC. As a result of these solicitations, the fund received some $77,000 in contributions.

In October 1976, another lobbying group, the Committee for an Effective Congress, filed a complaint against ERCC with the Commission, alleging violation of 2 U. S. C. § 441b(b)(4). The complaint asserted that NRWC had violated this section of the Act by using corporate funds to solicit contributions to ERCC from persons who were not NRWC's stockholders, executive or administrative personnel, or their families. NRWC did not deny these assertions, but took

---

[4] The separate segregated fund may be completely controlled by the sponsoring corporation or union, whose officers may decide which political candidates contributions to the fund will be spent to assist. The "fund must be separate from the sponsoring union [or corporation] only in the sense that there must be a strict segregation of its monies" from the corporation's other assets. *Pipefitters* v. *United States*, 407 U. S. 385, 414–417 (1972). See also *Buckley* v. *Valeo*, 424 U. S. 1, 28, n. 31 (1976).

the position that the recipients of its solicitation letters were "members" of NRWC within the proviso set forth in § 441b(b)(4)(C). The Commission found probable cause to believe that a violation had occurred, and after completing the investigative procedures set out in the statute and unsuccessfully attempting to resolve the matter through conciliation, see 2 U. S. C. § 437g (1976 ed., Supp. V), it authorized the filing of a civil enforcement suit. This litigation followed.

Essential to the proper resolution of the case is the interpretation of § 441b(b)(4)(C)'s statement that the prohibition against corporate solicitation contained in § 441b(b)(4)(A) shall not prevent "a . . . corporation without capital stock . . . from soliciting contributions to [a separate segregated fund established by a corporation without capital stock] *from members of such . . . corporation . . . .*" (Emphasis added.) The Court of Appeals rejected the Commission's contentions regarding the meaning of "member," and went on to hold that the term "embraces at least those individuals whom NRWC describes as its active and supporting members." 214 U. S. App. D. C., at 220, 665 F. 2d, at 376. The opinion of the Court of Appeals indicates that this construction was reached at least in part because of concern for the constitutional implications of any narrower construction. *Id.*, at 218–220, 665 F. 2d, at 374–376. As explained below, we reject this construction.

The statutory purpose of § 441b, as outlined above, is to prohibit contributions or expenditures by corporations or labor organizations in connection with federal elections. 2 U. S. C. § 441b(a). The section, however, permits some participation of unions and corporations in the federal electoral process by allowing them to establish and pay the administrative expenses of "separate segregated fund[s]," which may be "utilized for political purposes." 2 U. S. C. § 441b(b)(2)(C). The Act restricts the operations of such segregated funds, however, by making it unlawful for a cor-

poration to solicit contributions to a fund established by it from persons other than its "stockholders and their families and its executive or administrative personnel and their families." 2 U. S. C. § 441b(b)(4)(A). Finally, and of most relevance here, the section just quoted has its own proviso, which states in pertinent part that "[t]his paragraph shall not prevent a . . . corporation without capital stock, or a separate segregated fund established by a . . . corporation without capital stock, from soliciting contributions to such a fund from members" of the sponsoring corporation. 2 U. S. C. § 441b(b)(4)(C). The effect of this proviso is to limit solicitation by nonprofit corporations to those persons attached in some way to it by its corporate structure. *Ibid.*

The Court of Appeals, as we have noted, construed the term "member" in § 441b to embrace "at least those individuals whom NRWC describes as its active and supporting members." 214 U. S. App. D. C., at 220, 665 F. 2d, at 376. The two categories of members recognized by NRWC were described in the following terms by the Court of Appeals:

> "NRWC attracts members by publicizing its position on issues relating to compulsory unionism through advertisements, personal contacts, and, primarily, letters. These letters describe the purpose of NRWC, urge the recipient to assist NRWC (by, for example, writing to legislators), request financial support, and ask the recipient to respond to a questionnaire that will determine whether that person shares a similar political philosophy. A person who, through his response, evidences an intention to support NRWC in promoting voluntary unionism qualifies as a member. A person who responds without contributing financially is considered a supporting member; a person who responds and also contributes is considered an active member. NRWC sends an acknowledgement and a membership card to both classes. In the regular course of operations, NRWC's members receive newsletters, action alerts, and re-

sponses to individual requests for information. They respond to issue surveys and are asked to communicate with their elected representatives when appropriate. *See* Joint App., vol. II, at 387 *et seq.*" *Id.*, at 217, n. 1, 665 F. 2d, at 373, n. 1.

In respondent's view, both categories satisfy the membership requirement of § 441b(b)(4)(C).

The Commission, however, insists that these standards of "membership" are too fluid and insubstantial to come within the statutory term "member," and argues further that they do not comply with the Commission's regulation defining the term:

> "(e) 'Members' means all persons who are currently satisfying the requirements for membership in a membership organization, trade association, cooperative, or corporation without capital stock . . . . A person is not considered a member under this definition if the only requirement for membership is a contribution to a separate segregated fund." Federal Election Commission Regulations, 11 CFR § 114.1(e) (1982).

The Commission also contends that NRWC's Virginia articles of incorporation, filed by respondent, which state that respondent has no members, are dispositive. While we do not feel sufficiently informed at this time to attempt an exegesis of the statutory meaning of the word "members" beyond that necessary to decide this case, we find it relatively easy to dispose of these arguments that respondent's solicitation was limited to its "members," since in our view this would virtually excise from the statute the restriction of solicitation to "members."

Section 441b(b)(4)(C) was one of several amendments to the Act enacted in 1976. The entire legislative history of the subsection appears to be the floor statement of Senator Allen who introduced the provision in the Senate and explained the purpose of his amendment in this language:

> "Mr. President, all this amendment does is to cure an omission in the bill. It would allow corporations that do not have stock but have a membership organization, such as a cooperative or other corporations without capital stock and, hence, without stockholders, to set up separate segregated political funds as to which it can solicit contributions from its membership; since it does not have any stockholders to solicit, it should be allowed to solicit its members. That is all that the amendment provides. It does cover an omission in the bill that I believe all agree should be filled." 122 Cong. Rec. 7198 (1976).

This statement suggests that "members" of nonstock corporations were to be defined, at least in part, by analogy to stockholders of business corporations and members of labor unions. The analogy to stockholders and union members suggests that some relatively enduring and independently significant financial or organizational attachment is required to be a "member" under § 441b(b)(4)(C). The Court of Appeals' determination that NRWC's "members" include anyone who has responded to one of the corporation's essentially random mass mailings would, we think, open the door to all but unlimited corporate solicitation and thereby render meaningless the statutory limitation to "members."

We also assume, since there is no body of federal law of corporations, see *Burks* v. *Lasker,* 441 U. S. 471, 477 (1979), that Congress intended at least some reference to the laws of the various States dealing with nonprofit corporations. In an analogous situation, where Congress had authorized state taxation of "real property" of subsidiaries of the Reconstruction Finance Corporation, the Court said:

> "We think the congressional purpose can best be accomplished by application of settled state rules as to what constitutes 'real property,' so long as it is plain, as it is here, that the state rules do not effect a discrimination against the Government, or patently run counter to

the terms of the Act." *RFC* v. *Beaver County*, 328 U. S. 204, 210 (1946).

Like property, the structure and powers of nonprofit corporations are defined principally by state law; as in the case of property, state law provides some guidance in deciding whether NRWC's solicitation was confined to its "members."

Most States apparently permit nonprofit corporations to have "members" similar to shareholders in a business corporation, although state statutes generally do not seem to require this form of organization, see, *e. g.*, ALI-ABA, Model Nonprofit Corporation Act § 11 (1964); in many States the board of directors of a nonprofit corporation may be an autonomous, self-perpetuating body.[5] Given the wide variety of treatment of the subject of membership in state incorporation laws, and the focus of the Commission's regulation on the corporation's own standards, we think it was entirely permissible for the Commission in this case to look to NRWC's corporate charter under the laws of Virginia and the bylaws adopted in accordance with that charter.

Applying the statutory language as we interpret it to the facts of this case,[6] we think Congress did not intend to allow the 267,000 individuals solicited by NRWC during 1976 to

---

[5] One commentator has stated:

"The license provided by the statutes in this respect is further enhanced by their loose use of the term 'member.' The New York statute and the Model Act, for example, offer no meaningful definition of 'member' at all, but instead provide that a corporation's articles or bylaws may designate anybody or nobody as members, or may designate different classes of members, and may freely specify the rights, if any, of the corporation's members or classes of members. The California Act is a bit more carefully drawn in this regard, defining a member, essentially, as anyone entitled to vote in elections either for the corporation's board of directors or for certain fundamental corporate changes." Hansmann, Reforming Nonprofit Corporation Law, 129 U. Pa. L. Rev. 497, 578 (1981) (footnote omitted).

[6] We assume, as have the parties and courts below, that ERCC satisfies the statutory requirements of a "separate segregated fund" and that NRWC is a corporation covered by § 441b.

come within the exclusion for "members" in 2 U. S. C. § 441b(b)(4)(C). Although membership cards are ultimately sent to those who either contribute or respond in some other way to respondent's mailings, the solicitation letters themselves make no reference to members. Members play no part in the operation or administration of the corporation; they elect no corporate officials, and indeed there are apparently no membership meetings. There is no indication that NRWC's asserted members exercise any control over the expenditure of their contributions. Moreover, as previously noted, NRWC's own articles of incorporation and other publicly filed documents explicitly disclaimed the existence of members. We think that under these circumstances, those solicited were insufficiently attached to the corporate structure of NRWC to qualify as "members" under the statutory proviso.

Unlike the Court of Appeals, we do not think this construction of the statute raises any insurmountable constitutional difficulties. The Court of Appeals expressed the view that the sort of solicitations involved here would neither corrupt officials nor coerce members of the corporation holding minority political views, the two goals which it believed Congress had in mind in enacting the statutory provisions at issue. That being so, the Court of Appeals apparently thought, and respondent argues here, that the term "members" must be given an elastic definition in order to prevent impermissible interference with the constitutional rights enunciated in cases such as *NAACP* v. *Button,* 371 U. S. 415 (1963), and *Schaumburg* v. *Citizens for a Better Environment,* 444 U. S. 620 (1980). Similarly, respondent places considerable reliance on our statement in *Buckley* v. *Valeo,* 424 U. S. 1, 25 (1976):

"The Court's decisions involving associational freedoms establish that the right of association is a 'basic constitutional freedom,' *Kusper* v. *Pontikes,* 414 U. S., at 57, that is 'closely allied to freedom of speech and a right

which, like free speech, lies at the foundation of a free society.' *Shelton* v. *Tucker*, 364 U. S. 479, 486 (1960). See, *e. g.*, *Bates* v. *Little Rock*, 361 U. S. 516, 522–523 (1960); *NAACP* v. *Alabama*, [357 U. S.], at 460–461; *NAACP* v. *Button*, *supra*, at 452 (Harlan, J., dissenting). In view of the fundamental nature of the right to associate, governmental 'action which may have the effect of curtailing the freedom to associate is subject to the closest scrutiny.' *NAACP* v. *Alabama*, *supra*, at 460–461.' "

Under this standard, respondent asserts, the Act's restriction of its solicitation cannot be upheld.

While we fully subscribe to the views stated in *Buckley*, in the very next sentence to the passage quoted by the respondent, the Court went on to say:

"Yet, it is clear that '[n]either the right to associate nor the right to participate in political activities is absolute.' *CSC* v. *Letter Carriers*, 413 U. S. 548, 567 (1973)." *Ibid.*

In this case, we conclude that the associational rights asserted by respondent may be and are overborne by the interests Congress has sought to protect in enacting § 441b.

To place respondent's constitutional claims in proper perspective, we repeat language used in *Buckley* v. *Valeo*, *supra*, at 13:

"The constitutional power of Congress to regulate federal elections is well established and is not questioned by any of the parties in this case."

The first purpose of § 441b, petitioners state, is to ensure that substantial aggregations of wealth amassed by the special advantages which go with the corporate form of organization should not be converted into political "war chests" which could be used to incur political debts from legislators who are aided by the contributions. See *United States* v. *Automobile Workers*, 352 U. S. 567, 579 (1957). The second purpose

of the provisions, petitioners argue, is to protect the individuals who have paid money into a corporation or union for purposes other than the support of candidates from having that money used to support political candidates to whom they may be opposed. See *United States* v. *CIO*, 335 U. S. 106, 113 (1948).

We agree with petitioners that these purposes are sufficient to justify the regulation at issue. Speaking of corporate involvement in electoral politics, we recently said:

> "The overriding concern behind the enactment of statutes such as the Federal Corrupt Practices Act was the problem of corruption of elected representatives through the creation of political debts. The importance of the governmental interest in preventing this occurrence has never been doubted." *First National Bank of Boston* v. *Bellotti*, 435 U. S. 765, 788, n. 26 (1978) (citations omitted).

Likewise, in *Buckley* v. *Valeo, supra,* at 26–27, we specifically affirmed the importance of preventing both the actual corruption threatened by large financial contributions and the eroding of public confidence in the electoral process through the appearance of corruption. These interests directly implicate "the integrity of our electoral process, and, not less, the responsibility of the individual citizen for the successful functioning of that process." *United States* v. *Automobile Workers, supra,* at 570.

We are also convinced that the statutory prohibitions and exceptions we have considered are sufficiently tailored to these purposes to avoid undue restriction on the associational interests asserted by respondent. The history of the movement to regulate the political contributions and expenditures of corporations and labor unions is set forth in great detail in *United States* v. *Automobile Workers, supra,* at 570–584, and we need only summarize the development here. Seventy-five years ago Congress first made financial contributions to federal candidates by corporations illegal by enacting the

Tillman Act, ch. 420, 34 Stat. 864. Within the next few years Congress went further and required financial disclosure by federal candidates following election, Act of June 25, 1910, ch. 392, 36 Stat. 822, and the following year required pre-election disclosure as well. Act of Aug. 19, 1911, ch. 33, 37 Stat. 25. The Federal Corrupt Practices Act, passed in 1925, extended the prohibition against corporate contributions to include "anything of value," and made acceptance of a corporate contribution as well as the giving of such a contribution a crime. 43 Stat. 1070.

The first restrictions on union contributions were contained in the second Hatch Act, 54 Stat. 767, and later, in the War Labor Disputes Act of 1943, § 9, 57 Stat. 167, union contributions in connection with federal elections were prohibited altogether. These prohibitions on union political activity were extended and strengthened in the Taft-Hartley Act, 61 Stat. 136, which broadened the earlier prohibition against contributions to "expenditures" as well. Congress codified most of these provisions in the Federal Election Campaign Act of 1971, 86 Stat. 3, and enacted later amendments in 1974, 88 Stat. 1263, in 1976, 90 Stat. 475, and in 1980, 93 Stat. 1339. Section 441b(b)(4)(C) is, as its legislative history indicates, merely a refinement of this gradual development of the federal election statute.

This careful legislative adjustment of the federal electoral laws, in a "cautious advance, step by step," *NLRB* v. *Jones & Laughlin Steel Corp.*, 301 U. S. 1, 46 (1937), to account for the particular legal and economic attributes of corporations and labor organizations warrants considerable deference, see *Rostker* v. *Goldberg*, 453 U. S. 57, 64, 67 (1981). As we discuss below, it also reflects a permissible assessment of the dangers posed by those entities to the electoral process.

In order to prevent both actual and apparent corruption, Congress aimed a part of its regulatory scheme at corporations. The statute reflects a legislative judgment that the special characteristics of the corporate structure require par-

ticularly careful regulation. See *United States* v. *Morton Salt Co.,* 338 U. S. 632, 652 (1950). While § 441b restricts the solicitation of corporations and labor unions without great financial resources, as well as those more fortunately situated, we accept Congress' judgment that it is the potential for such influence that demands regulation. Nor will we second-guess a legislative determination as to the need for prophylactic measures where corruption is the evil feared. As we said in *California Medical Assn.* v. *FEC,* 453 U. S. 182, 201 (1981), the "differing structures and purposes" of different entities "may require different forms of regulation in order to protect the integrity of the electoral process."[7]

To accept the view that a solicitation limited only to those who have in the past proved "philosophically compatible" to the views of the corporation *must* be permitted under the statute in order for the prohibition to be constitutional would ignore the teachings of our earlier decisions. The governmental interest in preventing both actual corruption and the appearance of corruption of elected representatives has long been recognized, *First National Bank of Boston* v. *Bellotti, supra,* at 788, n. 26, and there is no reason why it may not in this case be accomplished by treating unions, corporations,

---

[7] Our decision in *First National Bank of Boston* v. *Bellotti,* 435 U. S. 765 (1978), is entirely consistent with our conclusion here. *Bellotti* struck down a prohibition against corporate expenditures and contributions in connection with state referenda. *Id.,* at 768. The Court explicitly stated that its decision did not involve "the constitutionality of laws prohibiting or limiting corporate contributions to political candidates or committees, or other means of influencing *candidate elections.*" *Id.,* at 788, n. 26 (emphasis added). In addition, following its citation of *Pipefitters* v. *United States,* 407 U. S. 385 (1972); *United States* v. *Automobile Workers,* 352 U. S. 567 (1957); and *United States* v. *CIO,* 335 U. S. 106 (1948), the Court specifically pointed out that in elections of candidates to public office, unlike in referenda on issues of general public interest, there may well be a threat of real or apparent corruption. As discussed in text, Congress has relied on just this threat in enacting § 441b.

and similar organizations differently from individuals. *California Medical Assn.* v. *FEC*, *supra*, at 201.

Respondent also asserts a claim of unconstitutional vagueness, relying on such additional cases as *Connally* v. *General Construction Co.*, 269 U. S. 385 (1926); *Grayned* v. *City of Rockford*, 408 U. S. 104 (1972); *Speiser* v. *Randall*, 357 U. S. 513 (1958); and *Smith* v. *California*, 361 U. S. 147 (1959). We think the vagueness claim is adequately answered by the language quoted earlier from *CSC* v. *Letter Carriers*, 413 U. S. 548, 567 (1973). There may be more than one way under the statute to go about determining who are "members" of a nonprofit corporation, and the statute may leave room for uncertainty at the periphery of its exception for solicitation of "members." However, on this record we are satisfied that NRWC's activities extended in large part, if not *in toto*, to people who would not be members under any reasonable interpretation of the statute. See *Broadrick* v. *Oklahoma*, 413 U. S. 601 (1973).[8]

The judgment of the Court of Appeals is reversed.

*It is so ordered.*

---

[8] We also reject as meritless NRWC's claim that the Commission's actions prior to and during conciliation were so misleading and arbitrary as to constitute a deprivation of due process. We leave open for consideration upon remand, *inter alia*, the propriety of the Commission's imposition of a $10,000 civil penalty against respondent.