**COMMUNITY ADVOCATE, INC. et al., Appellants,**

v.

**OHIO ELECTIONS COMMISSION, Appellee.**

[Cite as *Community Advocate, Inc. v. Ohio Elections Comm.* (1997), 124 Ohio App.3d 70.]

Court of Appeals of Ohio,
Tenth District, Franklin County.

No. 97APE06–816.

Decided Nov. 13, 1997.

*McTigue & Brooks* and *Donald J. McTigue,* for appellants.

*Betty D. Montgomery,* Attorney General, and *David M. Gormley,* Assistant Attorney General, for appellee.

---

TYACK, Presiding Judge.

On December 13, 1995, Lonnie W. Lewis, a candidate for Indian Springs, Ohio/Fairfield Township trustee in the November 1995 election, filed a complaint with the Ohio Elections Commission ("OEC") against Community Advocate, Inc. ("Community Advocate") and Joseph P. Ebbing. Lewis alleged that Community Advocate and Ebbing violated R.C. 3599.03, which prohibits corporations from engaging in certain political activity. Specifically, Lewis took issue with certain statements made in one of Community Advocate's newsletters that urged people not to vote for him.

Community Advocate, a nonprofit corporation, and Ebbing, its incorporator and statutory agent, responded with a motion to dismiss, contending that R.C. 3599.03, as applied to them, is unconstitutional. On August 23, 1996, the OEC mailed its decision, finding that Community Advocate and Ebbing had violated R.C. 3599.03 and imposing a $100 fine.

Community Advocate and Ebbing appealed the decision to the Franklin County Court of Common Pleas. On June 3, 1997, the common pleas court rendered its decision, finding that R.C. 3599.03 was constitutional, and that the OEC had the authority to impose a fine. A judgment entry concluding that the OEC's decision was supported by reliable, probative and substantial evidence and was in accordance with law was journalized on June 3, 1997. Community Advocate and Ebbing (collectively, "appellants") have appealed to this court, assigning three errors for our consideration:

"Assignment of Error No. 1

"The Trial Court erred in holding that R.C. § 3599.03(A) and (B), as applied to Appellant's, do not violate Appellants' rights to free speech and association guaranteed under the United States and Ohio Constitutions.

"Assignment of Error No. 2

"The Trial Court erred in holding that R.C. § 3599.03(B) is not unconstitutionally vague or overbroad.

"Assignment of Error No. 3

"The Trial Court erred in holding that the Ohio Elections Commission has authority to impose a fine for a violation of R.C. § 3599.03(A) and (B)."

Appellants' first assignment of error raises the issue of the constitutionality of R.C. 3599.03, as applied. Our review of this issue is *de novo.* See *Ohio Historical Soc. v. State Emp. Relations Bd.* (1993), 66 Ohio St.3d 466, 471, 613 N.E.2d 591, 595–596. The OEC found that appellants violated R.C. 3599.03(A) and (B), which state:

"(A) * * * no nonprofit corporation * * * directly or indirectly, shall pay or use, or offer, advise, consent, or agree to pay or use, the corporation's money or property * * * for or in aid of or opposition to * * * a candidate for election or nomination to public office * * * or for any partisan political purpose * * *.

"(B) No officer, stockholder, attorney, or agent of a * * * nonprofit corporation * * * shall knowingly aid, advise, solicit, or receive money or other property in violation of division (A) of this section."

Basically, these provisions prohibit a nonprofit corporation and/or its agents from using the corporation's money or property in aid of or in opposition to a candidate for public office. Appellants contend that as applied to them, R.C. 3599.03(A) and (B) unconstitutionally infringe on their rights to free speech and association.

In *Fed. Election Comm. v. Massachusetts Citizens For Life, Inc.* (1986), 479 U.S. 238, 107 S.Ct. 616, 93 L.Ed.2d 539 ("*MCFL*"), the Supreme Court addressed the constitutionality of R.C. 3599.03's federal counterpart, Section 441b, Title 2, U.S.Code ("Section 441b"), which prohibits corporations from using treasury funds to make an expenditure in connection with any federal election. The corporation in *MCFL,* like Community Advocate here, was nonprofit and published a newsletter. At issue in *MCFL* was a newsletter that listed candidates for state and federal office and identified each one as either supporting or opposing MCFL's prolife views. *Id.* at 243, 107 S.Ct. at 620, 93 L.Ed.2d at 547. The newsletter urged readers to vote "prolife." *Id.*

The Supreme Court stated that in order for an expenditure to be prohibited under Section 441b, it must constitute "express advocacy"—funds used for communications that expressly advocate the election or defeat of a clearly identified candidate. *Id.* at 248–249, 107 S.Ct. at 622–623, 93 L.Ed.2d at 550–551, citing *Buckley v. Valeo* (1976), 424 U.S. 1, 80, 96 S.Ct. 612, 663–664, 46 L.Ed.2d

659, 722–723. The court concluded that the statements in MCFL's newsletter constituted express advocacy and thus were in violation of Section 441b. *Id.* at 249–251, 107 S.Ct. at 623–624, 93 L.Ed.2d at 550–552. However, the court went on to determine whether Section 441b, as applied to MCFL, was constitutional.

The court noted that independent expenditures, such as the expenditure at issue in *MCFL*, constitute expression at the core of the electoral process and First Amendment freedoms. *Id.* at 251, 107 S.Ct. at 624, 93 L.Ed.2d at 552, citing *Buckley* at 39, 96 S.Ct. at 644–645, 46 L.Ed.2d at 699. The court, therefore, had to determine whether Section 441b's prohibition burdened political speech and if so, whether such burden was justified by a compelling state interest. *MCFL* at 251–252, 107 S.Ct. at 624–625, 93 L.Ed.2d at 552–553, citing *Buckley* at 44–45, 96 S.Ct. at 646–647, 46 L.Ed.2d at 702–703.

The *MCFL* court concluded that Section 441b burdened First Amendment rights. *Id.* at 255–256, 107 S.Ct. at 626–627, 93 L.Ed.2d at 554–555 (noting that the fact that the statute's practical effect may discourage protected speech was sufficient to characterize Section 441b as an infringement on First Amendment activities). The court then went on to discuss the rationale behind the regulation of corporate political activity.

The rationale for such regulation includes the need to restrict the influence of political war chests funneled through the corporate form, to eliminate the effect of aggregated wealth on elections, to curb the political influence of those who exercise control over large aggregations of capital, and to regulate the substantial aggregations of wealth amassed by the special advantages that go with the corporate form of organization. *Id.* at 257, 107 S.Ct. at 627, 93 L.Ed.2d at 555–556, citing *Fed. Election Comm. v. Natl. Conservative Political Action Commt.* (1985), 470 U.S. 480, 501, 105 S.Ct. 1459, 1470–1471, 84 L.Ed.2d 455, 472–473; *Pipefitters v. United States* (1972), 407 U.S. 385, 416, 92 S.Ct. 2247, 2264–2265, 33 L.Ed.2d 11, 31; *United States v. Automobile Workers* (1957), 352 U.S. 567, 585, 77 S.Ct. 529, 538, 1 L.Ed.2d 563, 574–575; and *Fed. Election Comm. v. Natl. Right to Work Commt.* (1982), 459 U.S. 197, 207, 103 S.Ct. 552, 559, 74 L.Ed.2d 364, 375.

The court stated that concern over the influence of concentrated corporate wealth reflects the conviction that it is important to protect the integrity of the marketplace of political ideas. *MCFL*, 479 U.S. at 257, 107 S.Ct. at 627, 93 L.Ed.2d at 555–556. Direct corporate spending on political activity raises the prospect that resources amassed in the economic marketplace may be used to provide an unfair advantage in the political marketplace. *Id.* Hence, regulation of corporate political activity has reflected concern not about the use of the corporate form *per se*, but about the potential for unfair deployment of wealth for political purposes. *Id.* at 259, 107 S.Ct. at 628–629, 93 L.Ed.2d at 557.

Given this rationale for regulation of corporate political activity, the court went on to conclude that groups such as MCFL do not pose the danger of corruption that more traditional corporations that have been the focus of regulation can pose. *Id.* The court stated that the concerns underlying the regulation of corporate political activity were absent with regard to MCFL. *Id.* at 263, 107 S.Ct. at 630–631, 93 L.Ed.2d at 559–560. Therefore, there was no compelling interest justifying infringement of MCFL's First Amendment freedoms. *Id.*

The court specified three features of MCFL that were essential to its holding that MCFL could not constitutionally be bound by Section 441b's restriction on independent spending: (1) it was formed for the express purpose of promoting political ideas and cannot engage in business activities; (2) it has no shareholders or other persons affiliated so as to have a claim on its assets or earnings; and (3) it was not established by a business corporation or labor union, and it is its policy not to accept contributions from such entities (this prevents such corporations from serving as conduits for the type of direct spending that creates a threat to the political marketplace). *Id.*, 479 U.S. at 263–264, 107 S.Ct. at 630–631, 93 L.Ed.2d at 559–561.

In the case at bar, the parties do not dispute that certain statements in the third edition newsletter constituted express advocacy.[1] R.C. 3599.03(A) prohibits nonprofit corporations from using corporate money or property in opposition to a candidate for political office. Hence, the statements in the newsletter (more precisely, appellants' use of corporate money/property to generate the newsletter containing such statements) violate the words of R.C. 3599.03(A) and (B). As noted above, appellants contend that the statutes, as applied to them, are unconstitutional.

Appellants contend that Community Advocate shares the same essential features that the Supreme Court noted were present in the nonprofit corporation in *MCFL.* As to the first feature, Community Advocate's articles of incorporation indicate that the purpose of the corporation is to engage in civic and community educational activities. This, of course, is a very general purpose, and the more specific purpose for which the corporation was formed can be better gleaned from the affidavit of its incorporator, Ebbing, and the newsletters.

In his affidavit, Ebbing states that the purpose of the corporation includes disseminating information regarding issues of public concern and the position taken by public officials regarding such issues. Ebbing states that one of those issues relates to the attempted annexation of Fairfield Township by the city of

---

1. Such statements include "DO NOT VOTE FOR LONNIE LEWIS!" and "Lonnie Lewis should not be reelected."

Hamilton, followed by the attempted incorporation of the township as a village and subsequent elevation to city status.

Community Advocate published three newsletters. Each newsletter's contents consisted entirely of political discussion, almost all of such discussion being centered on the annexation issue. There is no other evidence regarding what the corporation did. There is no evidence that it engaged or planned to engage in business activities. Hence, the evidence shows Community Advocate's essential purpose, in practice, was to engage in the promotion of certain political ideas and was not to conduct business activities.

In regard to the second feature, Community Advocate has no shareholders or other persons so affiliated as to have a claim on its assets or earnings.

As to the third feature in *MCFL*, Ebbing states in his affidavit that Community Advocate was not established by a business firm or association, and it has not received funding from such entities. The OEC contends that the facts here are distinguishable from those in *MCFL* because in *MCFL* the third feature was that it was the corporation's *policy* to not accept contributions from business entities. Here, asserts the OEC, the evidence merely shows that Community Advocate has not received such funding. The OEC points to a statement in Community Advocate's first newsletter that reads:

" * * * At this time we need input from you. In order to continue to provide newsletters we need to know:

" * * *

"3. *Would any local business people be interested in helping sponsor the newsletter?* " (Emphasis added.)

The OEC cites *Austin v. Michigan Chamber of Commerce* (1990), 494 U.S. 652, 110 S.Ct. 1391, 108 L.Ed.2d 652, wherein the Supreme Court found a Michigan statute (similar to Section 441b and R.C. 3599.03) constitutional as applied to a nonprofit corporation. The court found that the corporation did not share the three features MCFL had. *Id.* at 662, 110 S.Ct. at 1398–1399, 108 L.Ed.2d at 666. First, the corporation's bylaws set forth varied purposes, several of which were not inherently political (such as dissemination of information regarding social, civic and economic conditions, training its members and promoting ethical business practices). *Id.*

As for the second feature, the court noted that the corporation did not have shareholders; however, members of the corporation may be reluctant to withdraw even if they disagreed with the corporation's political views because such members wish to benefit from the corporation's nonpolitical programs. *Id.* at 663, 110 S.Ct. at 1399, 108 L.Ed.2d at 666–667. The court stated that the

members of this corporation were more similar to shareholders of a business corporation than to the members of the *MCFL* corporation. *Id.*

The third feature, the court noted, relates to the corporation's independence from the influence of business corporations. *Id.* at 664, 110 S.Ct. at 1400, 108 L.Ed.2d at 667–668. The court emphasized that three-quarters of the corporation's members were business corporations, and such business corporations could funnel corporate money through the nonprofit corporation. *Id.*

For all of these reasons, the Supreme Court distinguished the corporation from the *MCFL* corporation and upheld the statute as applied. The OEC likens Community Advocate more to the corporation in *Austin* than to the corporation in *MCFL.* We disagree with this comparison.

There is no evidence that Community Advocate engaged in any other activities, let alone business activities, other than political activities. The corporation in *Austin* put on seminars and provided group insurance. *Austin,* 494 U.S. at 662, 110 S.Ct. at 1398–1399, 108 L.Ed.2d at 666. Here, the only evidence shows that Community Advocate published three newsletters consisting entirely of political expression.

Community Advocate's articles of incorporation indicate that the principal office is Ebbing's home and that the corporate trustees are Ebbing and two other family members also living at that address. There is no evidence indicating that the newsletter was generated by or through anyone other than Ebbing. There is no evidence indicating the existence of any other "members" of the corporation. Community Advocate is nonprofit, and there is no evidence of any assets of Community Advocate.

This is far different from the Michigan Chamber of Commerce in *Austin,* wherein there were more than eight thousand members who benefited from business services and contacts provided by the corporation and, as such, may have been reluctant to withdraw as members despite any disagreement with the corporation's political expressions. There simply is no evidence that Community Advocate engages in nonpolitical activity and/or has shareholders or members that may support the corporation for its nonpolitical activities/benefits despite its political views.

Lastly, Community Advocate is in no way similar to the *Austin* corporation when it comes to business funding. Community Advocate was never funded by businesses. It had no members that were businesses. The corporation in *Austin* was made up of three-quarters for-profit business corporations that could channel corporate money through the chamber. There is no such danger here, despite the one statement in the first newsletter asking local business people to help sponsor the newsletter.

The evidence shows Community Advocate is a nonprofit corporation formed and run by, essentially, one man in a small community for the purpose of expressing this man's views on the annexation of his village. In one newsletter, the corporation expressed opposition to a candidate for public office.

As stated in *MCFL,* 479 U.S. at 265, 107 S.Ct. at 631, 93 L.Ed.2d at 561:

"Where at all possible, government must curtail speech only to the degree necessary to meet the particular problem at hand, and must avoid infringing on speech that does not pose the danger that has prompted regulation."

As indicated above, Community Advocate poses none of the threats that other, more traditional corporations do in the political marketplace and that prompted regulation of corporate political activity. Thus, there is no compelling state interest to justify the burden on political speech. Therefore, R.C. 3599.03(A) and (B), as applied to this particular corporation and its agent, Ebbing, violate First Amendment freedoms of speech and expression and are unconstitutional as applied to this situation. The trial court, therefore, erred as a matter of law in upholding the OEC's decision.

Accordingly, appellants' first assignment of error is sustained.

Given our disposition of the first assignment of error, appellants' second and third assignments of error are rendered moot.

Having sustained the first assignment of error, and the second and third assignments of error being rendered moot, we reverse the judgment of the Franklin County Court of Common Pleas and remand this cause to the trial court with instructions to remand to the OEC with instructions to vacate its finding of a violation of R.C. 3599.03(A) and (B).

*Judgment reversed*
*and cause remanded.*

CLOSE and STRAUSBAUGH, JJ., concur.

DEAN STRAUSBAUGH, J., retired, of the Tenth Appellate District, sitting by assignment.