FEDERAL ELECTION COMMISSION,
Plaintiff,

v.

CALIFORNIA DEMOCRATIC PARTY,
et al., Defendants.

No. CIV–S–97–891 DFL PAN.

United States District Court,
E.D. California.

June 11, 1998.

Lawrence M. Noble, Richard B. Bader, Stephen E. Hershkowitz, Colleen T. Sealander, Federal Election Commission, Washington, DC, for Plaintiff.

Lance H. Olson, Mary–Beth, Moylan, Olson, Hagel, Leidigh, Waters & Fishburn, L.L.P., Sacramento, CA, for Defendants.

## JOINT STATUS REPORT

BURRELL, District Judge.

NOW COME PLAINTIFF AND DEFENDANTS, by and through their respective counsel of record, and submit a Joint Status Report in compliance with Federal Rule of Civil Procedure 16 and the Court's Orders filed May 9, 1997, and September 2, 1997.

## ORDER

Defendants California Democratic Party ("CDP") [1] and Gary Paul move to dismiss Plaintiff's complaint for failure to state a claim upon which relief can be granted. Fed. R.Civ.P. 12(b)(6). Plaintiff Federal Election Commission ("FEC" or "Commission") opposes the motion. For the reasons stated,

Defendant CDP's motion is denied and Defendant Paul's motion is granted.

### I.

### STANDARDS APPLICABLE TO A RULE 12(b)(6) MOTION

On a motion to dismiss brought under Rule 12(b)(6), all material allegations in the complaint must be accepted as true and the complaint must be construed in the light most favorable to the plaintiff. *Scheuer v. Rhodes,* 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974); *NL Industries, Inc. v. Kaplan,* 792 F.2d 896, 898 (9th Cir.1986); *North Star International v. Arizona Corporation Commission,* 720 F.2d 578, 580 (9th Cir.1983). The court is bound to give the plaintiff the benefit of every reasonable inference to be drawn from well-pleaded allegations of the complaint. *Retail Clerks Int'l Ass'n v. Schermerhorn,* 373 U.S. 746, 753 n. 6, 83 S.Ct. 1461, 10 L.Ed.2d 678 (1963). A complaint "should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957); *Hishon v. King & Spalding,* 467 U.S. 69, 73, 104 S.Ct. 2229, 81 L.Ed.2d 59 (1984).

### II.

### BACKGROUND

This dispute concerns financial contributions from Defendant CDP to a ballot measure committee called "Taxpayers Against Deception—No on 165" ("No on 165") made in the months preceding the 1992 general election. Construing the allegations in the light most favorable to the FEC, the pertinent facts are as follows.

No on 165 was a registered political committee organized for the purpose of raising and spending funds to defeat Proposition 165, which was a measure intended to reduce state spending on welfare and other social programs. *See* Pl.'s Compl. at ¶¶ 12, 21. As part of its strategy to defeat the proposition,

**1.** Defendants CDP, Democratic State Central Committee of California–Federal and Democratic
State Central Committee of California–Non–Federal will be referenced collectively as the CDP.

No on 165 engaged in a large-scale effort to register and turn out voters who would oppose the proposition, under a plan that was also designed to increase the number of voters "who would vote for the Democratic candidates, including Democratic candidates for federal office." *Id.* at 20, 26.

In June 1992 the chairman of the voter registration effort for No on 165, Mr. Dean Tipps, approached the CDP's executive director to discuss the possibility of obtaining funding. *Id.* at ¶¶ 14, 32. To entice the CDP into contributing, Tipps emphasized that the CDP would benefit from No on 165's efforts because the potential registrants were predisposed to vote for Democrats based on historical voting patterns. *Id.* at ¶ 33. The CDP then agreed to commit between $400,000 and $750,000 to No on 165, depending on the success of CDP's own fundraising efforts. *Id.* at ¶ 34.

The voter registration drive was conducted in accordance with policies developed by No on 165, which included targeting Democrats and counting only Democratic registrants in their totals. *Id.* at ¶¶ 28–30. To carry out those policies, No on 165's field workers "were told they had to meet a quota of [Democratic] voters registered per day in order to remain employed." *Id.* at ¶ 36. Field supervisors were instructed to help self-identified Democratic registrants in completing their voter registration cards, but no such help was to be given to self-identified Republican registrants. *Id.* at ¶ 37. Several of those supervisors conducted their voter registration activities under a sign that read "Stop Pete Wilson—Register Democrat." *Id.* at ¶ 38. In addition, names and addresses of newly registered Democrats were kept by No on 165 to facilitate get-out-the-vote activities. *Id.* at ¶¶ 41, 42.

Tipps provided weekly reports about the progress of the voter registration efforts to the executive director of the CDP, who was responsible for approving No on 165's periodic requests for funds. *Id.* at ¶¶ 43–45. Both Tipps and the CDP executive director kept the Democratic National Committee and representatives from the campaigns of various federal candidates apprised of No on 165's voter registration efforts. *Id.* at ¶¶ 47–48.

Ultimately, the CDP contributed $719,000 to No on 165, nearly all of which was used to register Democratic voters. *Id.* at ¶¶ 50–51, 54. The CDP's contributions to No on 165 were made entirely from its "non-federal committee account," which contained union and corporate funds. *Id.* at ¶¶ 18, 20, 55. These contributions were not reported to the FEC. *Id.* at ¶ 55.

After attempting to conciliate with the CDP, the FEC filed its complaint alleging violations of the Federal Election Campaign Act of 1971 ("FECA" or "Act"), 2 U.S.C. § 431, et seq., and the regulations promulgated thereunder. Specifically, the FEC asserts in its complaint that the CDP violated 2 U.S.C. § 441b and 11 C.F.R. §§ 102.5(a)(1)(i), 104.10(b)(4) and 106.5(d) by (1) using an account containing corporate and union funds to make expenditures in connection with a federal election, (2) failing to allocate the expenditures for the generic voter drive between its federal and non-federal committee accounts, and (3) failing to report to the FEC any amounts that were or should have been allocated. *Id.* at ¶ 59.

### III.

### ANALYSIS

### A.

### OVERVIEW OF APPLICABLE STATUTES AND REGULATIONS

Under the FECA, it is unlawful for a union or a corporation to use its general treasury "to make a contribution or expenditure in connection with any election" in which the electorate will vote for certain enumerated federal offices. 2 U.S.C. § 441b(a). A "contribution or expenditure" is defined to include "any direct or indirect payment . . . to any candidate, campaign committee, or political party or organization, in connection with" an election for any of the enumerated federal offices. 2 U.S.C. § 441b(b)(2).

The FECA vests the Commission with "primary and substantial responsibility for administering and enforcing the Act." *Buckley v. Valeo*, 424 U.S. 1, 109, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976). The Act empowers the

Commission "to make such rules 'as are necessary to carry out the provisions of [the] Act.'" *Id.* at 110, 96 S.Ct. 612 (quoting 2 U.S.C. § 437d(a)(8)). The Commission's enforcement power under the Act "is both direct and wide ranging." *Id.* at 111, 96 S.Ct. 612.

The Commission's regulations at issue here permit a political party committee to create separate "federal" and "non-federal" accounts into which it may accept contributions. 11 C.F.R. § 102.5(a)(1)(i). The former account can only contain funds raised in accordance with the limitations and restrictions of the FECA. The latter can contain what is popularly known as "soft money," comprised of contributions "from sources who would be barred from making such contributions in connection with a federal election, e.g. from corporations and labor unions." *Common Cause v. Federal Election Comm'n,* 692 F.Supp. 1391, 1392 (D.D.C. 1987); 11 C.F.R. § 102.5(a)(1)(i). Party committees may use the funds from their nonfederal account for activities that affect only state and local elections. However, when they make disbursements for activities connected with both federal and non-federal elections, they must make those disbursements either entirely from the federal account or allocate the expenses between their federal and non-federal accounts according to a prescribed method. 11 C.F.R. § 106.5(a)(1). Under the Commission's regulations, state and local party committees are required to allocate the costs of "generic voter drives," 11 C.F.R. § 106.5(d)(1),

> including voter identification, voter registration, and get-out-the-vote drives, or any other activities that urge the general public to register, vote or support candidates of a particular party or associated with a particular issue, without mentioning a specific candidate.

11 C.F.R. § 106.5(a)(2)(iv). Such allocations must be reported to the FEC. 11 C.F.R. § 104.10(b).

2. The FEC has ruled that "contributions or expenditures relating only to and exclusively to ballot referenda issues, and not to elections to any political office, do not fall within the purview

**B.**

## CDP'S MOTION

The CDP's motion to dismiss the complaint is based on essentially three grounds. First, it asserts that the facts in the complaint do not demonstrate that the CDP itself violated the FEC's allocation or reporting regulations. Second, it argues that the regulations cannot be construed to apply to the factual scenario pled in the complaint without exceeding the promulgating authority conferred on the FEC by Congress. Third, it contends that application of the regulations to these facts is unconstitutional.

### 1. *Violation of Regulations*

██ The CDP first argues that since it did not itself conduct the voter registration drive, the money it gave to No on 165 was not subject to the allocation regulations. The CDP asserts that the complaint shows only that the CDP made a contribution for the purpose of opposing a state ballot measure,[2] that the CDP did not require the funds to be used in a particular manner, and that at most, the CDP had knowledge that funds would be used to conduct a voter registration drive. *See* Defs.' Mot. Dismiss at 8. Thus, the CDP contends that the FEC failed to allege that the CDP engaged in any activities subject to FEC regulations. The Commission rejoins that the CDP's contributions to No on 165 were subject to the regulations because the situation presented is no different than if the CDP conducted the voter registration drive itself or hired someone to do so. *See* Pl.'s Opp'n at 11–12.

Since under dismissal jurisprudence the Court "must accept all material allegations in the complaint as true and construe them in the light most favorable to [the Commission]," *Kaplan,* 792 F.2d at 898, the CDP's argument fails. The complaint avers that the CDP made its contributions with the knowledge that No on 165 would use them to register Democrats. No on 165's goal was not merely to register opponents of Proposition 165, but rather to register Democrats

of the [FECA]." *See* Advisory Opinion 1989–32, C.C.H. ¶ 5989, Defs.' Request for Judicial Notice ("RJN"), Exh. C.

who would vote in a general election that included state and federal candidates. According to the complaint, the executive director of the CDP, who approved periodic payments to No on 165, was given weekly reports on the success of the voter drive. The success of that voter drive was measured in terms of the numbers of Democrats registered. Further, nearly all of the $719,000 contributed by the CDP to No on 165 was spent on the voter registration effort. Thus, it is conceivable that these facts, if proven, could show that the voter registration drive was conducted on behalf of the CDP.

### 2. *FEC's Construction of Regulations and the FECA*

■ The CDP next argues that even if it is deemed to have conducted the voter registration drive described in the complaint, it was not subject to the allocation regulations because the voter drive did not urge support or opposition of federal candidates. The CDP argues that because the FECA regulates only federal elections, *see Common Cause*, 692 F.Supp. at 1395, the regulations requiring allocation of costs for generic voter drives can apply only where such activities are conducted with explicit support or opposition of a federal candidate. *See* Defs.' Mot. at 11–12. The CDP contends this is the only construction permitted under the Commission's promulgating authority.

"The interpretation of statutes and regulations by an agency charged with their administration is entitled to due deference and should be accepted unless demonstrably irrational or clearly contrary to the plain meaning." *Nevitt v. United States,* 828 F.2d 1405, 1406–07 (9th Cir.1987); *Federal Election Comm'n v. Ted Haley Congressional Comm.,* 852 F.2d 1111, 1114 (9th Cir.1988). The FEC "is precisely the type of agency to which deference should presumptively be afforded." *Federal Election Comm'n v. Democratic Senatorial Campaign Comm.,* 454 U.S. 27, 37, 102 S.Ct. 38, 70 L.Ed.2d 23 (1981).

Here, the FEC's determination that the costs of a targeted effort to register Democrats to vote in a general election must be allocated between the CDP's federal and non-federal accounts is consistent with the plain meaning of the regulations. By contrast, the construction of 11 C.F.R. § 106.5(a)(2)(iv) advanced by the CDP would contravene its express language. Section 106.5(a)(2)(iv) requires a party committee to allocate the costs for "generic voter drives ... that urge the general public to register, vote or support candidates of a particular party ... *without mentioning a specific candidate.*" 11 C.F.R. § 106.5(a)(2)(iv) (emphasis added). This regulation clearly cannot be read to apply only where a federal candidate is mentioned, since its express language encompasses situations where no candidate is mentioned. Therefore, the CDP's proffered construction of this regulation is rejected.

■ The CDP's argument that the allocation regulations are beyond the scope of the FEC's promulgating authority is also unpersuasive. The FECA was amended by Congress in 1979 to permit state and local party committees to spend money for voter registration and get-out-the-vote activities, but required those activities to be financed with funds "subject to the limitations and prohibitions of the Act." *See* 2 U.S.C. §§ 431(8)(B)(xii)(2) & 431(9)(B)(ix)(2); *Common Cause,* 692 F.Supp. at 1394. In *Common Cause,* the plaintiff objected to the FEC's practice of allowing party committees to allocate the costs of these activities between state and federal purposes, arguing that the 1979 amendments required that all expenditures made by a state or local party committee in a federal election year must come from funds raised under the FECA's restrictions. *Common Cause,* 692 F.Supp. at 1395. Because the FECA regulates only federal elections, the court rejected the broad construction of the statute advanced by the plaintiffs. *Id.* However, the court held that

the FEC's failure to regulate improper or inaccurate allocation between federal and nonfederal funds with respect to [voter registration and get-out-the-vote activities] was contrary to law, since Congress clearly stated in the FECA that all monies spent by state committees on these activities vis-a-vis federal elections must be paid for "from contributions subject to the limitations and prohibitions of the Act."

*Id.* The court cited to legislative history demonstrating that the allocation of funds be-

tween federal and non-federal activities was precisely what Congress had in mind when it enacted the provisions permitting state and local party committees to fund voter registration activities. *Id.* (citing H.Rep. No. 422, 96th Cong., 1st Sess., 8 (1979)). Congress recognized that generic voter registration activities would inure to the benefit of both state and federal candidates, and that such activities should not be funded solely with unregulated soft money. Therefore, it does not appear that the regulations exceed the promulgating authority conferred by Congress.[3]

### 3. Constitutionality

The CDP argues that the allocation regulations are unconstitutional as they are applied in this case for two reasons. First, the CDP asserts that the regulations restrict its ability to engage in non-federal "issue advocacy" protected by the First Amendment. Second, it asserts that restrictions on voter drive activities impermissibly curtail their First Amendment associational rights.

■ The parties agree that the CDP could use funds unregulated by the FECA to engage in non-federal issue advocacy. *See* Pl.'s Opp'n at 14–15. However, the complaint can be read to allege that the CDP engaged in activities that went beyond such advocacy. The complaint decries the CDP's funding of a voter registration drive that was directed at registering Democrats who would vote in a federal election. The complaint avers that registrants who were self-identified Republicans were neither assisted with filling out their registration cards nor counted in No on 165's voter registration totals, regardless of whether the Republican registrant opposed Proposition 165. Thus, the activity alleged to be illegal is not the contribution of soft money to defeat Proposition 165, but rather the contribution of this money to register Democrats to vote in a general election involving federal candidates. For the stated reasons, the CDP has not shown that these allegations implicate their rights to engage in non-federal issue advocacy.

■ The CDP next argues that the FEC's regulation of voter registration activities impermissibly infringes on the CDP's associational rights under the First Amendment. The CDP contends that since its membership is determined solely by the amount of members it registers to vote, the FEC's regulation of voter registration activity "directly impacts CDP's ability to draw and maintain a strong membership." *See* Defs.' Mot. Dismiss at 22. According to the CDP, "[t]he FEC has no jurisdiction to interfere or regulate the way in which CDP identifies its members, or the types of funds it uses to support such identification drives." *See id.*

However, the CDP fails to support this argument with authority. While political parties have protected associational rights under the First Amendment, *see Tashjian v. Republican Party of Connecticut,* 479 U.S. 208, 214, 107 S.Ct. 544, 93 L.Ed.2d 514 (1986), those rights are not absolute. *Buckley,* 424 U.S. at 25, 96 S.Ct. 612. The Supreme Court has made clear that associational rights "may be . . . overborne by the interests Congress has sought to protect in enacting § 441b." *Federal Election Comm'n v. National Right to Work Comm.,* 459 U.S. 197, 207, 103 S.Ct. 552, 74 L.Ed.2d 364 (1982). As with its predecessor provisions, "the concern of [§ 441b] 'is with the use of corporation or union funds to influence the public at large to vote for a particular candidate or a particular party.' " *Federal Election Comm'n v. Massachusetts Citizens for Life, Inc.,* 479 U.S. 238, 247, 107 S.Ct. 616, 93 L.Ed.2d 539 (1986) (quoting *United States v. International Union United Auto.,* 352 U.S. 567, 589, 77 S.Ct. 529, 1 L.Ed.2d 563 (1957)). The Supreme Court has repeatedly recognized the importance of Congress's interest in restricting the use of such funds to prevent "the corruption or appearance of corruption of the political process that might result if such contributions were not restrained." *California Medical Ass'n v. Federal Election Comm'n,* 453 U.S. 182, 195, 101

---

**3.** Congressional approval of the FEC's allocation regulations can also be gleaned from the fact that they were submitted to Congress for the thirty day legislative review period prescribed by 2 U.S.C. § 437d. "Congress failed to disapprove the regulation[s] which 'strongly implies that the

regulations accurately reflect congressional intent.' " *Ted Haley Congressional Comm.,* 852 F.2d at 1114 (quoting *Grove City College v. Bell,* 465 U.S. 555, 568, 104 S.Ct. 1211, 79 L.Ed.2d 516 (1984)).

S.Ct. 2712, 69 L.Ed.2d 567 (1981) (plurality opinion) (citing *Buckley,* 424 U.S. at 38, 96 S.Ct. 612); *National Right to Work Comm.,* 459 U.S. at 207–08, 103 S.Ct. 552; *First National Bank of Boston v. Bellotti,* 435 U.S. 765, 788 n. 26, 98 S.Ct. 1407, 55 L.Ed.2d 707 (1978). Moreover, the allocation regulations at issue here are sufficiently tailored to restrict only funds that would contravene the policies behind § 441b. The CDP is free to conduct partisan voter registration activities with regulated funds, and it is permitted to use unregulated soft money for the proportionate benefit of those activities on state and local elections. Therefore, since the CDP failed to establish that its associational rights are infringed, its motion is denied.

### C.

### GARY PAUL'S MOTION

 Defendant Gary Paul, who is a former treasurer of the CDP, seeks dismissal because he was not the treasurer at the time of the alleged violations of the FECA. The FEC concedes this point, but argues that Paul should not be dismissed because he was treasurer both during the FEC's efforts to conciliate this matter and at the time the complaint was filed. For these reasons, the FEC asserts that Paul can be sued in his "official capacity as treasurer" "to ensure that sanctions and remedies eventually ordered by the Court will be carried out, including the correction of the Democratic Committees' reports covering the relevant period." *See* Pl.'s Opp'n at 21–22; Pl.'s Compl. at ¶ 8.

However, the FEC appears to seek a civil penalty against Paul as an individual. The FEC failed to provide authority for holding Paul liable for a civil penalty under the FECA for acts that occurred prior to his tenure as treasurer. The only cases cited by the FEC in support of its argument involved situations where a treasurer was alleged to have violated a personal obligation under the FECA. Since there is no allegation that Defendant Paul violated any personal obligation, the individual capacity claims against him are dismissed. Further, since Paul is no longer treasurer of the CDP, and thus, is not the appropriate person against whom an official capacity suit could be maintained, he is dismissed.

### IV.

### CONCLUSION

For the reasons stated, Defendant CDP's motion is denied. Defendant Gary Paul's motion is granted.

IT IS SO ORDERED.